IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| DERRELL DICKERSON,<br>    Plaintiff,<br><br>v.<br><br>ROCK ISLAND POLICE OFFICER IBRAHIM RAMIREZ, CITY OF ROCK ISLAND, SHERIFF OF ROCK ISLAND COUNTY, and ROCK ISLAND COUNTY,<br>    Defendants. | Case No. 4:13-cv-04003-JEH |

**Opinion**

Now before the Court is Defendant Sheriff of Rock Island County's and Defendant Rock Island County's Motion for Summary Judgment (Doc. 69). The Motion is fully briefed, and for the reasons set forth below, the Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

On March 10, 2015, the Plaintiff filed his Amended Complaint in which he alleged that he was "unreasonably arrested" on February 17, 2011, injured by the arresting officer's "unreasonable force" used against him during the arrest, and then placed in the Rock Island County Jail (Jail) from February 18, 2011 to February 20, 2011. He brought the following three claims against the Sheriff of Rock Island County (Sheriff) and the County of Rock Island (County) based upon the circumstances of his detention at the Jail: 1) a violation of the Rehabilitation Act (RA); 2) a violation of the Americans with Disabilities Act (ADA); and 3) a violation of 42 U.S.C. § 1983.

1

I

On February 17, 2011, at approximately 11:53 p.m., Rock Island City Police Officer Ibrahim Ramirez (Ramirez) responded to the area of 7th St. and 7th Ave. in Rock Island, Illinois in reference to a white female bleeding from the face.[1] Plaintiff Derrell Dickerson was arrested at the scene and during the arrest he complained of injury to his back. The Plaintiff was transported to Trinity Medical Center by the Rock Island Fire Department where he was examined and treated, and was thereafter transported to the Rock Island County Jail (the Jail) by ambulance. Rock Island Fire Department medical personnel removed the Plaintiff's prosthetic legs while he was in the ambulance.[2] At 2:03 a.m. on Friday, February 18, 2011, the Plaintiff was brought into the Jail on a gurney and was placed in holding cell 8, a single person holding cell, by Rock Island Fire Department personnel.

The holding cell in which he was placed was in a part of the Jail built in 1986. The Jail's holding cells are used for a variety of purposes including housing inmates that have not yet been cleared to be housed in another unit of the Jail, medical observation, and suicide watch. The holding cells are not equipped with grab bars because the cells were built prior to the passage of the ADA and because the grab bars would impose a risk of self-harm to suicidal inmates. Construction of the newer ADA accessible wing of the jail was started in 1999 and completed in 2001. The new wing includes handicap accessible

---

[1] The Plaintiff attributed his back injury to Officer Ramirez. In his Amended Complaint (Doc. 41), the Plaintiff brought claims against Officer Ramirez and the City of Rock Island for Officer Ramirez's alleged use of excessive force in addition to the claims brought against the Sheriff and the County. Only Defendants Sheriff and County have moved for summary judgment on the Plaintiff's claims under the RA, ADA, and Section 1983. Accordingly, the facts set forth herein are those pertaining to the Plaintiff's RA, ADA, and Section 1983 claims.

[2] In 2002, the Plaintiff was in a train accident that resulted in him losing portions of both legs and his left arm. He is able to ambulate with prosthetic legs. Amended Complaint (Doc. 41 at pg. 1). The Plaintiff is a disabled individual and is entitled to reasonable accommodation under the ADA. Dfts' MSJ Undisputed Material Fact (UMF) 30.

facilities which, in turn, includes a day room with hand bars where inmates can be housed. The bathrooms in the dayroom are equipped with handicapped accessible bars. The Plaintiff was held in the day room on previous occasions when detained at the Jail. First floor holding cells, where the Plaintiff was held on February 18, 2011, were subject to visual inspection at least every 30 minutes. Corrections staff must make a written report of anything unusual or any unusual inmate movements or notify shift command of any emergencies. The Defendants explain that they defer to, among other things, the Illinois County Jail Standards. Those Standards are silent with respect to how disabled inmates, including but not limited to those who are non-ambulatory, should be treated.

The Plaintiff had been admitted to the Jail 14 times between 2002 and his February 18, 2011 detention. Prior to February 18-20, 2011, at other times when the Plaintiff was incarcerated at the Jail, corrections officers placed him in a first-floor holding cell temporarily (for only as long as it took to book and process him into the Jail). Also, during those previous stays, Jail corrections officers gave the Plaintiff his limbs or a wheelchair or both to use in the holding cell. In order to reach and use the toilet and the sink in a first-floor holding cell at the Jail, the Plaintiff must have either his limbs or a wheelchair in the cell with him. If he has a wheelchair or his prosthetic limbs in a first-floor holding cell, the Plaintiff can transfer himself to and from the toilet in the cell. Although it is a physically difficult process for him, given the lack of a handicapped accessible bar adjacent to the toilets in the first-floor holding cells, he can get himself to the toilet only if he has his prosthetic limbs or a wheelchair and only if he has to. While he was detained in the Jail beginning on February 18, 2011, the Plaintiff threatened jail staff with litigation. He was in the Jail a total of 57 hours and 48 minutes (until February 20, 2011). The Plaintiff has been detained in the Jail seven times since February 2011.

After he was released from the Jail on February 20, 2011, the Plaintiff received treatment for his injuries sustained the night of his February 2011 arrest from Dr. Anthony Kwan and Dr. Joseph Brooks.

On September 28, 2015, the Defendants filed their Motion for Summary Judgment on all three claims the Plaintiff brought against them.

## II

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A movant may show the absence of material fact by citing to admissible evidence in the record or by showing that the nonmovant "cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A), (B). The party opposing summary judgment must not merely rest upon the allegations of his complaint but must instead also point to admissible evidence in the record to show that a material fact is genuinely disputed. *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (explaining that the plaintiff must "present affirmative evidence in order to defeat a properly supported motion for summary judgment").

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Id.* at 248. There is a genuine dispute of material fact only where there is sufficient evidence favoring the nonmoving party that would permit a jury to return a verdict in the nonmoving party's favor. *Brummet v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III

As an initial matter, the Defendants argue that the Court should disregard the Plaintiff's Declaration to the extent it contradicts his prior deposition testimony. They argue that the Plaintiff seeks to rewrite history via his

Declaration for the sole purpose of creating a material issue of fact to defeat summary judgment. The Court will not disregard the Plaintiff's Declaration (Doc. 80-1) which was submitted with the Plaintiff's Response to the Defendants' Motion for Summary Judgment. The Defendants ask the Court to disregard the Declaration to the extent it contradicts the Plaintiff's prior deposition testimony. However, the Seventh Circuit does not prohibit use of such declarations. *See Payne v. Pauley*, 337 F.3d 767, 771-72 (7th Cir. 2003) (explaining that a "self-serving" affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts provided the evidence within the affidavit "meets the usual requirements for evidence presented on summary judgment"). The Defendant also fails to direct the Court to any specific inconsistencies between the Plaintiff's deposition testimony and the Declaration.

IV

The Defendants argue that Section 504 of the RA does not apply to the Plaintiff's claim against the County because the County does not receive federal funding. The Defendants concede in their Reply that the Sheriff does receive federal funding, but for the RA to apply, the relevant entity (here the County) must also accept federal funds. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015), *citing Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).

Summary judgment is denied as to the Plaintiff's RA claim against the County because the undisputed record evidence shows that the County, too, receives federal funding. The Plaintiff's Exhibit 6, the Rock Island County Budget Performance Report for Fiscal Year to Date: 2/28/11, indicates that the County received $6,832 in federal grants for public safety. (Doc. 80-6 at pg. 4). Under *Phipps v. Sheriff of Cook County*, this is enough to meet the federal funding requirement. 681 F. Supp. 2d 899, 912 (N.D. Ill. 2009) ("[F]or purposes of the RA,

it is not necessary that the federal funding be connected in any way with the ADA, or indeed with any other particular federal statute").

V

The Defendants also request summary judgment on the Plaintiff's ADA claim. To establish a violation of Title II of the ADA, a plaintiff must prove: 1) that he is a qualified individual with a disability; 2) that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity; and 3) that the denial or discrimination was by reason of his disability. *Wagoner*, 778 F.3d at 592; 42 U.S.C. § 12132. Here, there is no dispute that the Plaintiff is a qualified individual with a disability and that the ability to use the toilet and wash are "services" covered by Title II of the ADA. *See Jaros*, 684 F.3d at 672 (stating that the meals and showers made available to inmates are a program or activity under the ADA). The parties instead dispute whether there is a genuine issue of material fact as to whether the Plaintiff was denied or discriminated against regarding those services by reason of his disability.

1

Under the ADA, the Sheriff of Rock Island County is vicariously liable for the actions of his employees, i.e. the individual correctional officers. *Hildreth v. Cook Cnty.*, No. 08 C 3506, 2010 WL 1656810, at *5 (N.D. Ill. Apr. 23, 2010) (explaining that the Seventh Circuit and other federal circuit courts have agreed that when a plaintiff asserts a cause of action against an employer-municipality under either the ADA or RA, the public entity is liable for the vicarious acts of *any* of its employees as specifically provided by the ADA") (internal citations omitted) (emphasis in original). Furthermore, the County is an indispensable party because it is obligated to pay any judgment against the Sheriff in his official capacity. *Carver v. Sheriff of LaSalle Cnty.*, 787 N.E.2d 127, 138 (Ill. 2003)

(concluding that the county is obligated to provide funds to the county sheriff to pay official capacity judgments entered against the sheriff's office); *Carver v. Sheriff of LaSalle Cnty.*, 324 F.3d 947, 948 (7th Cir. 2003) ("a county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer" (i.e. sheriff)).

Also, in order to recover compensatory damages under the ADA, a plaintiff must show intentional discrimination. *Phipps*, 681 F. Supp. 2d at 917. Though the Seventh Circuit "has yet to decide whether discriminatory animus or deliberate indifference is required to show intentional discrimination," courts within the Seventh Circuit and elsewhere have determined that intentional discrimination can be inferred from a defendant's deliberate indifference. *Strominger v. Brock*, 592 F. App'x 508, 511 (7th Cir. 2014) (noting the Seventh Circuit has yet to decide); *S.H. ex rel. Durrell v. Lower Meriod School Dist.*, 729 F.3d 248, 264 (3d Cir. 2013) (holding that a showing of deliberate indifference may satisfy a claim for compensatory damages under the ADA and RA); *Meagley v. City of Little Rock*, 639 F.3d 384, 390 (8th Cir. 2011) (holding that the plaintiff could not recover compensatory damages under the ADA or RA where she failed to show intentional discrimination through proof of deliberate indifference or otherwise); *Reed v. Illinois*, -- F. Supp. 3d --, No. 14 C 2247, 2015 WL 4727754, at *5 (N.D. Ill. Aug. 10, 2015) (holding that allegations of deliberate indifference satisfy the intentional discrimination requirement for ADA and RA damages claims). Deliberate indifference, in turn, "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

### 2

Here, there are disputed material facts regarding whether the correctional officers were deliberately indifferent to the Plaintiff's need for an

accommodation.  Specifically, the following facts are in dispute with regard to the Plaintiff's placement in the dayroom of the Jail:  a) during his detention, the Plaintiff refused to be seen by Larry Peterson, the doctor who provides inmate medical services at the Jail; b) on prior occasions, the Plaintiff has been drunk and combative and on at least one occasion threw his legs at a corrections officer; c) for the safety of both injured inmates being booked into the jail and inmates already housed in dayrooms, some of whom have health problems, inmates must undergo a medical exam prior to being housed in a dayroom to ensure that they do not have any contagious diseases, infections, or pose a risk to other inmates, including a mandatory TB test; d) corrections officers never asked or required the Plaintiff to undergo a TB test; e) corrections officers never asked the Plaintiff any screening questions, including any medical screening questions, which are part of the normal booking procedure, and the Plaintiff did not give the answers on the Medical Screen History Report where many of them were obviously false given the known circumstances; and f) corrections officers never asked or required the Plaintiff to undergo a medical exam during February 18, 20, 2011 nor during any other time he has been incarcerated at the Jail because that was not the procedure that was followed at the Jail.

　　In this regard, the Defendants argue that the best possible accommodation for the Plaintiff would have been to be housed in the newer ADA compliant annex (the dayroom) to the Jail where the Plaintiff had been housed previously. They contend that because he was not compliant with jail procedures, refused to go to court, and had a history in the jail of being drunk and combative, and had previously thrown his legs at corrections staff, he was sufficiently accommodated by placing him in a holding cell with his prosthetic legs and a wheelchair. Accordingly, the Defendants argue that any potential denial of accommodation was not based on the Plaintiff's disability, but instead based on jail concerns for

detainee and staff safety and the Plaintiff's own actions in refusing to comply with jail policies.  It is clear from the disputed facts identified above that there is a material dispute as to whether the Plaintiff's own actions and history in the Jail were the reason that he was not placed in the Jail's dayroom.  Though the Defendants argue that the Plaintiff's refusal to undergo a medical exam was a reason jail staff were not able to place him in the dayroom, the Plaintiff denies that he ever refused medical treatment or examination during his February 2011 detention, denies that a medical exam was standard procedure as he never had one at the jail, and does not recall that corrections officers ever asked him any medical screening questions at any time.  (Doc. 80-1).  There is also a dispute as to the Medical Screen History Report that the Defendants say was completed on February 19, 2011 and time stamped 12:44 p.m. (Doc. 80-5).  Significantly, as the Plaintiff points out in his Response, even taking the Defendants' facts as true that he underwent a medical screening on February 19, 2011, the medical screening that was done did not occur until Dickerson had been in the jail for over 34 hours and after that, he still was not placed in the dayroom at any point through February 20, 2011.  The Defendants do not point to any evidence to contradict the fact that the Plaintiff was not placed in the dayroom even after he underwent the "required" medical exam.  Material questions therefore remain.

Moreover, even taking the Defendants' version of facts as true - that the Plaintiff could not be placed in the dayroom due to his own actions – they were not relieved entirely from providing the Plaintiff with a reasonable accommodation while he was detained in the Jail.  In other words, the fact that the Defendants had *one* way available to reasonably accommodate the Plaintiff does not render them free of liability under the ADA.

The following facts are in dispute with regard to the Plaintiff's placement in a first-floor holding cell of the Jail:  a) on Saturday, February 19, 2011 at 12:44

9

p.m., the Plaintiff was photographed smiling in a wheelchair; b) the Plaintiff did not request any additional or different modification nor did he make any complaints to corrections staff, Jail administration, the Sheriff, or the judge; c) for inmates in the holding cells, requests are made on a request slip and no such requests were generated regarding the Plaintiff's February 2011 detention; d) where the Rock Island Sheriff's Office Correctional Facility and Criminal Justice Center Standard Operations and Procedural Manual is silent with respect to the needs of disabled detainees, the Sheriff and Jail staff defer to the Illinois County Jail Standards, the ADA, and guidance from the staff nurse and a qualified on-site medical doctor who is not employed by the Sheriff or County; e) the Plaintiff made no mention to his doctors at any time following the incident that he was ever made to lay on a floor of a jail for days; f) the Plaintiff's prosthetic limbs were carried by ambulance personnel into the Jail and leaned up against the wall adjacent to and outside the door of his cell where they remained the entire time he was incarcerated; g) another person, Roland Cherry, detained at the Jail during the time the Plaintiff was there saw the Plaintiff in a first-floor holding cell and saw his prosthetic legs leaning outside Plaintiff's cell door; h) corrections officers never at any time allowed the Plaintiff to have and use his prosthetic limbs in the holding cell and his limbs were only returned to him when he was released; i) during his detention, the Plaintiff requested to corrections officers over 20 times to have his prosthetic limbs and/or a wheelchair to use in the holding cell[3]; j) the Plaintiff repeatedly explained his need for his prosthetic limbs or a wheelchair to the corrections officers on duty; k) in response to the Plaintiff's requests to clean the cell after he urinated and defecated on the floor of

---

[3] In his Declaration, the Plaintiff explained that he continued to ask the corrections officers on duty for his limbs or a wheelchair every time they walked by his cell which was about every 30 minutes. It is undisputed that first floor holding cells (where Dickerson was) are subject to a visual inspection at least every 30 minutes. (Doc. 69-9).

his cell, corrections officers refused to clean the cell and so the Plaintiff was forced to sit in his own waste; l) the Sheriff does not provide training on handling the physical needs of inmates with disabilities, including those who are unable to ambulate in and around their cells; and m) the only time that the Plaintiff was provided with a wheelchair to use was during the brief time he went to court on February 20, 2011 and the wheelchair was taken back from him immediately after he returned to the cell from court.

      The Defendants argue that there is no evidence that corrections staff denied him the use of his legs or a wheelchair while he was in the holding cell. The Plaintiff argues that the Defendants callously refused to provide him with his limbs or a wheelchair, though they knew he needed one or the other in order to be able to use the toilet where they previously provided him with either of those items fourteen other times and even after he threatened them with litigation. In addition to the disputed facts listed above, the Defendants point out that the Plaintiff did not file any formal complaints after his release and at all times attributed his injuries to the altercation with the police during his arrest. Whereas the Defendants cite to just one questionable photo and otherwise point to the *absence* of evidence in the record that the Plaintiff was not refused a wheelchair and/or prosthetic limbs during his February 2011 detention, the Plaintiff cites to evidence that he was affirmatively denied his prosthetic limbs and/or a wheelchair. For example, as listed above, the Plaintiff denies that he was provided a wheelchair during the entire duration of his stay at the jail in February 2011,[4] except for the brief period when he was eventually taken to court on February 20, 2011. He also denies that he was given his prosthetic limbs at

---

[4] The Plaintiff further argues that the Defendants' assertion that Dickerson was in a wheelchair in his February 19, 2011 booking photo is based upon only partial clues from the photo. The Plaintiff counters that it is not at all clear that Dickerson was sitting in a wheelchair in that booking photo.

any time he was detained in February 2011. He points to evidence that on February 18, 2011 he specifically requested that he be given a wheelchair so he could go to court and that the corrections officer flatly refused and only offered Plaintiff the one option to walk on his prosthetic limbs. (Doc. 80-1). The Plaintiff explained in his Declaration that when he was given that option, he was still in too much pain and could not use them to walk the distance to court. *Id*. The Plaintiff also points to his and Cherry's Declarations in which they state that the Plaintiff asked for his limbs which remained outside of his cell. Cherry's Declaration further provides that he overheard the Plaintiff ask corrections officers on duty to give him his "legs" or a wheelchair so he could get off of the floor and use the toilet.[5] Finally, the Plaintiff stated in his Declaration that whenever he had been put in a first floor holding cell in the Jail before and after February 18, 2011, he always had either his limbs or a wheelchair and the corrections officers knew that. (Doc. 80-1).

Thus, there also remains a genuine dispute as to whether the Defendants denied the Plaintiff the ability to use the toilet and wash by reason of his disability while he was in the alternative to the dayroom, a holding cell, for over 57 hours by not providing him with his prosthetic limbs and/or a wheelchair.

Ultimately, material disputes remain for trial as to whether the Plaintiff was denied reasonable accommodation or discriminated against on the basis of his disability and whether the failure to reasonably accommodate or discriminate was done intentionally.

---

[5] The Defendants argue that Cherry submitted a version of events that have him and Dickerson located together in a "large glass holding tank" though Cherry's own inmate log shows that he was housed in a separate holding cell from that which held the Plaintiff. *See* (Doc. 82-2 at pg. 2) (R.I. CO. JAIL – FIRST FLOOR map).

## VI

Finally, the Defendants seek summary judgment on the Plaintiff's Section 1983 claim. To state a claim under 42 U.S.C. § 1983, a plaintiff must show: 1) that the defendants acted under color of state law; and 2) that the defendants deprived him of some right under the Constitution or the laws of the United States. *Ienco v. City of Chi.*, 286 F.3d 994, 997-98 (7th Cir. 2002). Here, the Plaintiff argues he was deprived of his rights secured by the Fourth[6] and Fourteenth Amendments. Under Section 1983, there is no *respondeat superior* liability. *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). Therefore, in order to prevail against the sheriff in his official capacity, a plaintiff must show that an official policy or custom caused the injury. *Id.*; *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985), *citing Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). A plaintiff must point to: 1) an express policy which caused the injury; 2) a widespread practice that is so well-settled as to amount to a policy; or 3) a constitutional injury that was caused by a person with final policy-making authority. *Monell*, 436 U.S. at 690.

The parties dispute the extent to which the Sheriff and County Jail had policies to deal with disabled inmates. The Defendants cite to their Answer #2 to the Plaintiff's Second Set of Interrogatories Propounded Upon Defendants Sheriff and Rock Island County in which they answered:

> [N]either the Sheriff nor the Rock Island County Jail have a specific policy or procedure requiring corrections officers to make accommodations for the physical needs of inmates with known physical disabilities who are unable to ambulate around their cells. The Sheriff and the Rock Island County Jail defer to the Rock Island County Sheriff's Office Correctional Facility and Criminal Justice

---

[6] The Plaintiff's counsel acknowledged at oral argument that this was incorrect, as the Eighth Amendment provides authority for the Plaintiff's Section 1983 claim. *See Smith v. Sangamon Cnty. Sheriff's Dep't, 715 F.3d 188, 191 (7th Cir. 2013)*.

13

> Center Standard Operations and Procedure Manual, Chapter 4, Medical Services, the Illinois County Jail Standards, the Americans with Disabilities Act as it applied to buildings built before 1991, subject to the Prison Litigation Reform Act, and guidance from the staff nurse and a qualified on-site medical doctor, who is not employed by the Sheriff of Rock Island County or Rock Island County.

(Doc. 69-13 at pgs. 3-4).  The Plaintiff counters that the Illinois County Jail Standards and the ADA contain no general or specific policies or procedures with respect to a jail's treatment of disabled inmates.  The Plaintiff also cites to the specific part of the Defendants' Answer to his Interrogatory No. 2 in which the Defendants answered that "neither the Sheriff nor the Rock Island County Jail have a specific policy or procedure requiring corrections officers to make accommodations for the physical needs of inmates with known physical disabilities who are unable to ambulate around their cells."  *Id*.  Accordingly, here, the policy alleged is *inaction* on the Sheriff's part, as in the *lack* of a policy which addresses accommodating inmates who cannot ambulate due to a disability.

However, for liability to attach to the Sheriff in this case, the Plaintiff must show that the Sheriff was deliberately indifferent as to the known or obvious consequences of the lack of a policy addressing disabled inmates at the Jail. *Gable v. City of Chi.*, 296 F.3d 531, 537-38 (7th Cir. 2002).  In other words, the Plaintiff must show that the lack of such a policy created "a risk of serious harm that was so patently obvious that the [Sheriff] must have been aware of a risk of harm and, by failing to act to rectify it, sanctioned the harmful conduct." *Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 192 (7th Cir. 2013) (internal citation omitted).

14

The Plaintiff has not presented any evidence to create a material factual question as to whether the Sheriff was subjectively aware of the risks posed by failing to have a policy addressing inmates who could not ambulate.  In fact, the record is devoid of any evidence concerning the subjective knowledge of the Sheriff.  The evidence that *is* in the record demonstrates that until the alleged incident, about which there is no evidence that the Sheriff was aware, there had never been a problem or an issue raised about inmates who could not ambulate.  Furthermore, the record is replete with evidence that on the numerous other occasions that the Plaintiff was held in the jail, he was held without incident and *with* accommodation for his disability.  The Sheriff is therefore entitled to summary judgment on the Plaintiff's Section 1983 claim.  Given that liability cannot be attached to the Sheriff on this claim, the liability of the County likewise does not attach.  *See Riley v. Cnty. of Cook*, 682 F. Supp. 2d 856, 860-61 (N.D. Ill. 2010) (explaining that complaint was improperly pled where it alleged liability on the county's part for the acts of officials at the county jail).  The Defendants' Motion for Summary Judgment is granted as to the Plaintiff's Section 1983 claim.

## VI

Based upon the foregoing, the Defendants' Motion for Summary Judgment (Doc. 69) is GRANTED IN PART and DENIED IN PART.  The Defendants' Motion is GRANTED as to the Plaintiff's Section 1983 claim.  The Defendants' Motion is DENIED as to the Plaintiff's Rehabilitation Act and Americans with Disabilities Act claims.  The Final Pretrial Conference remains set for February 10, 2016 at 11:00 a.m.

*It is so ordered.*

Entered on January 26, 2016.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE